IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 09-cv-02675-PAB-CBS

MELISSA DECKER and
MICHAEL HEAPHY,

 Plaintiffs,

v.

UNITED STATES FOREST SERVICE,
RICK CABLES, Regional Forester, United States Forest Service,
SCOTT FITZWILLIAMS, Supervisor for the White River National Forest, and
DAVID NEELY, District Ranger, Holy Cross Ranger District,

 Defendants.
_____

**ORDER**
_____

 This matter is before the Court on plaintiffs' second amended complaint [Docket No. 53] and plaintiffs' opening brief [Docket No. 72] challenging defendants' actions in implementing and approving the Upper Eagle River Beetle Salvage Project. Plaintiffs' claims are fully briefed and the matter is ripe for disposition. Plaintiffs' claims arise under the federal Administrative Procedures Act ("APA"), the Healthy Forest Restoration Act ("HFRA"), and the National Environmental Policy Act ("NEPA"). The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

**I. BACKGROUND**

 This action concerns plaintiffs' challenge to the proposed timber salvage project of the United States Forest Service ("the Forest Service") within the Holy Cross Ranger District of the White River National Forest. The project, called the Upper Eagle River

Beetle Salvage Project ("the project"), is a response to the mountain pine beetle infestation in northwest Colorado.  The Forest Service proposed to remove and salvage approximately 1,763 acres of beetle-infested lodgepole pine stands.  Pursuant to the project, 256 acres will be clearcut (removing all the trees in a stand), 1,490 acres will be "clearcut with leave trees" (leaving pockets of aspen, spruce and fir trees) and 27 acres will be "seed tree removal cut" (removing seed trees that would compete with regeneration).  The project is intended to accelerate the regeneration of the forest stands killed by pine beetles, to reduce hazardous fuel loads by removing dead and dying trees, to provide clear areas for fire suppression in the event of a wildfire, and to protect public safety by removing dead trees that will eventually fall on roads and trails. The primary method the project will use to remove these dead and dying trees is clearcutting.  The Forest Service intends to capture some of the economic value of the removed trees through commercial contracts.  The project covers an area divided into four geographical "pods": (1) Indian Creek pod; (2) West Grouse pod; (3) Tigiwon pod; and (4) Yoder pod.  Each of these pods is divided into treatment areas or "units."

The Forest Service proposed the project as an "authorized hazardous fuel reduction project" under the authority of the HFRA.  HFRA was enacted in 2003 to "reduce wildfire risk to communities, municipal water supplies, and other at-risk federal land" by "[a]s soon as practicable" implementing "authorized hazardous fuel reduction projects."  16 U.S.C. §§ 6501(1), 6512(a).  The statute defines "authorized hazardous fuel reduction projects" as "the measures and methods described in the definition of 'appropriate tools' contained in the glossary of the Implementation Plan, on Federal land."  16 U.S.C. § 6511(2).  HFRA, in turn, defines the Implementation Plan as "the

2

Implementation Plan for the Comprehensive Strategy for a Collaborative Approach for Reducing Wildland Fire Risks to Communities and the Environment, dated May 2002, developed pursuant to the conference report to accompany the Department of the Interior and Related Agencies Appropriations Act, 2001 (House Report No. 106-64 and subsequent revisions)."  16 U.S.C. § 6511.  The glossary of the most recent Implementation Plan defines "appropriate tools" as: "Methods for retaking hazardous fuels including prescribed fire, wildland fire use, and various mechanical methods such as crushing, tractor and hand piling, tree removal (to produce commercial or pre-commercial products), and pruning.  They are selected on a site-specific case and are ecologically appropriate and cost effective."  R. at D02842.

HFRA establishes an expedited administrative review process for authorized hazardous fuel reduction projects that does not use the full notice, comment, and appeal procedures applicable to most agency actions under 36 C.F.R. § 215 *et seq*. *See* 16 U.S.C. § 6515(a)(1); 36 C.F.R. § 218.3.  Under HFRA, only an abbreviated objection process is necessary.  *See* 36 C.F.R. § 218.1.  Individuals and organizations can submit written comments to the proposed hazardous fuel reduction project during a public comment period while the Forest Service prepares an Environmental Assessment ("EA") or Environmental Impact Statement ("EIS") for the project.  36 C.F.R. § 218.7.  This comment period allows the public to comment on a draft EA or EIS and occurs during "scoping" or the initial evaluation of the project.  *Id.*  Only individuals who submit written comments may file objections to the final EA or EIS during a thirty-day objection period.  *Id.*  A reviewing officer then responds to these objections and issues a Record of Decision ("ROD") or Decision Notice ("DN").  36

3

C.F.R. § 218.13.  This objection process is the sole means the public may use to challenge such a project.  36 C.F.R. § 218.1.

The public comment period for the project began in June 2007, after the Forest Service notified the public of the project in an initial scoping notice.  Plaintiffs, residents of the nearby town of Minturn, submitted comments during this period.  Plaintiffs' comments argued, among other things, that the project was not an "authorized hazardous fuel reduction project" under the HFRA, and that the Forest Service was required by law to complete an economic analysis and a full EIS for the project.  In November 2007, the Forest Service issued an EA for the project and thereafter plaintiffs submitted objections, again arguing that the project was not authorized under the HFRA, that it was not cost effective and that an EIS was necessary.  The Forest Service published a revised EA in March 2008 and plaintiffs again submitted objections, to which the Forest Service responded in writing.  After the close of the objection period, the Forest Service issued a finding of no significant impact ("FONSI") and Decision Notice approving the project.

After approving the project, the Forest Service intended to implement the project through timber sale contracts for each of the four pods.  The Forest Service initially awarded timber sale contracts for the entirety of the Yoder, Indian Creek, Tigiwon and West Grouse pods, but Units 101, 113 and 114 were removed from the West Grouse pod contract because the Forest Service determined that timber would have to be removed from these units using helicopter logging instead of traditional logging methods.  Helicopter logging uses helicopters instead of ground-based machinery to transport cut trees off of the forest floor and is considerably more expensive.  In June

4

2009, the Forest Service completed a Supplemental Information Report ("SIR")

assessing helicopter logging in these units and determining that it did not constitute a

significant change so as to require supplementing the DN or FONSI.  Subsequently, in

September 2009, the Forest Service entered into a stewardship contract for the

helicopter logging of Units 101, 113 and 114.  Stewardship contracts allow the Forest

Service to apply the value of the timber removed to offset the cost of the services

provided in removing the timber.  In June 2009, the Yoder pod contractor began logging

in the Yoder pod pursuant to the project and logging in this pod is now complete.  In

November 2009, the stewardship contractor began logging in Unit 101 of the West

Grouse pod.

On November 13, 2009, plaintiffs filed the original complaint in this case,

challenging the Forest Service's implementation of the project in Unit 101 and seeking

declaratory and injunctive relief.  The plaintiffs argued that the logging in Unit 101

materially diverged from the proposed action articulated in the EA.  The Court

conducted an evidentiary hearing on plaintiffs' request for a preliminary injunction and

issued an order on December 16, 2009 enjoining the Forest Service from (1) "carrying

out logging activities in Unit 101 north of the West Grouse Creek hiking trial or west of

the junction between the West Grouse Creek hiking trial and the Grouse Lake hiking

trial, unless or until it properly analyses this change of unit boundaries through

supplementation of the Environmental Assessment" and (2) from "engaging in

helicopter yarding in Unit 101 unless and until it properly analyses this change through

supplementation of the Environmental Assessment."  Docket No. 20 at 2.  The Court

also required that "any further analysis of the logging activities within Unit 101 must take

into account the economics of the project." *Id.*  This preliminary injunction expired on February 14, 2010.  Docket No. 70.

In response to the Court's order, the Forest Service issued a supplemental scoping notice on February 26, 2010, indicating that changed circumstances and new information required a supplemental assessment of the project.  Plaintiffs submitted comments in response to the scoping notice to the Forest Service on March 15, 2010. In April 2010, the Forest Service issued a Supplemental Environmental Assessment ("Supplemental EA").  Plaintiffs submitted objections to the Supplemental EA on May 14, 2010, to which the Forest Service responded on June 14, 2010.  The Forest Service ultimately issued a new Decision Notice on June 20, 2010.  The Decision Notice authorized the project as set forth in the Supplemental EA and made another finding of no significant impact.  Plaintiffs then filed their Second Amended Complaint challenging the new Decision Notice.

## II.  STANDARD OF REVIEW

Pursuant to the APA, the Court will set aside a final agency action only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  "An agency's decision is arbitrary and capricious if the agency (1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made 'a clear error of judgment.'" *New Mexico ex rel. Richardson v.*

6

*Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009) (quoting *Utah Envtl. Congress v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007)).  "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action."  *Id.* (quoting *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1178 (10th Cir. 2008)).

NEPA imposes procedural requirements on federal agencies undertaking "major federal actions" and failure to follow these procedures may be arbitrary and capricious, thus violating the APA.  *See id.* at 703.  NEPA was intended to ensure that agencies "consider environmentally significant impacts of a proposed action, and, in so doing, let the public know that the agency's decisionmaking process includes environmental concerns."  *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1162 (10th Cir. 2002).  Specifically, NEPA requires that "[b]efore an agency may take 'major Federal actions significantly affecting the quality of the human environment,' an agency must prepare an [EIS] in which the agency considers the environmental impacts of the proposed action and evaluate[s] 'alternatives to the proposed action,' including the option of taking 'no action.'"  *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006) (quoting 42 U.S.C. § 4332(2)(C); 40 C.F.R.  § 1502.14(d)).  Where, however, "it is unclear whether a proposed action requires an EIS, the agency may first prepare a less detailed [EA]," and "[i]f the EA leads the agency to conclude that the proposed action will not significantly affect the environment, the agency may issue a [FONSI] and forego the further step of preparing an EIS."  *Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004) (citing 40 C.F.R. §§

1501.4(b); 1501.4(e)).  Despite these requirements, NEPA does not dictate the substantive results of an agency's analysis, and "[s]o long as the record demonstrates that the agencies in question followed the NEPA procedures, which require agencies to take a 'hard look' at the environmental consequences of the proposed action, the court will not second-guess the wisdom of the ultimate decision." *Utahns for Better Transp.*, 305 F.3d at 1163 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).

NEPA's requirements apply to hazardous fuel reduction projects.  Although HFRA expedites normal notice and comment procedures, it still requires agencies to prepare either an EIS or an EA for each hazardous fuel reduction project.  *See* 16 U.S.C. § 6514.

## III.  ADMINISTRATIVE EXHAUSTION

"Plaintiffs must exhaust available administrative remedies before the [Forest Service] prior to bringing their grievances to federal court."  *Forest Guardians v. United States Forest Serv.*, 579 F.3d 1114, 1120 (10th Cir. 2009) (citing 7 U.S.C. § 6912(e); 36 C.F.R. § 215.21)).  The exhaustion requirement is intended to allow the agency "first shot" at resolving the problems raised by plaintiffs.  *See id.* (quoting *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002)).  Claims not raised before the agency "in sufficient detail to allow the agency to rectify the alleged violation" are waived, "unless the problems underlying the claim are 'obvious' or otherwise brought to the agency's attention."  *Id.* (quoting *Forest Guardians v. United States Forest Serv.*, 495 F.3d 1162, 1170 (10th Cir. 2007)).  Moreover, where a plaintiff

8

challenges an authorized hazardous fuel reduction project, HFRA further restricts the Court from considering any "issue" that was not raised in the administrative review process.  16 U.S.C. § 6515(c)(2).

## IV.  DISCUSSION

Plaintiffs assert four separate claims for relief pursuant to the APA, which the Court will address in turn.[1]

### A.  Failure to Provide Necessary Administrative Review Process

Plaintiffs contend that the project does not meet HFRA's definition of an "authorized hazardous fuel reduction project" and thus the Forest Service acted arbitrarily and capriciously by not undertaking the full administrative procedures described in 36 C.F.R. § 215 *et seq*.  Docket Nos. 53 at 14-17; 72 at 9-18.  Plaintiffs first argue that neither clearcutting, helicopter logging, nor stewardship contracts constitute "appropriate tools" so as to be authorized by HFRA.  *See* 16 U.S.C. § 6511(2).  Second, plaintiffs argue that the project is not cost-effective as required by the Implementation Plan.  *See* R. at D02842.

### 1.  Administrative Exhaustion

As a threshold matter, defendants submit that plaintiffs failed to exhaust their claims that the use of helicopter logging and stewardship contracting are not

---

[1] The parties' briefs discuss plaintiffs' claims in the opposite order than the claims are presented in the second amended complaint.  Because plaintiffs argue that if the Court grants its second two claims (failure to provide adequate administrative review and failure to prepare an EIS) its first two claims (relating to logging outside the boundaries of Units 101 and helicopter logging) will be moot, *see* Docket No. 72 [Pl.'s Br.] at 25, the Court will consider plaintiffs' claims in the order they are addressed in the briefs.

"appropriate tools" under HFRA because they did not present these issues during the administrative review process.  Docket No. 73 at 16-17.  Plaintiffs do not contest this argument in their reply brief.  *See* Docket No. 78.  Defendants are correct that, although plaintiffs' objections to the Supplemental EA contended that the project did not properly fall under HFRA, plaintiffs only objected that the project was not an "authorized hazardous fuel reduction project" because clearcutting was not an appropriate tool and it was not cost effective.  R. at D06839-40.  Plaintiffs' objections did not raise the issue of whether helicopter logging and stewardship contracts were "appropriate tools" under HFRA.  Given that, under HFRA, the Court may only consider an issue "if the issue was raised in [the] administrative review process," the Court finds that helicopter logging and stewardship contracts were not administratively exhausted and cannot be considered here.  *See* 16 U.S.C. § 6515(c)(2).

### 2. Chevron Deference

Defendants argue that the Forest Service's interpretation of "appropriate tools" in HFRA and "cost effective" in the Implementation Plan are entitled to heightened deference pursuant to *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984).  Docket No. 73 at 17-20; 26-28.  Under *Chevron*, courts must defer to an agency's interpretation of the statute it is responsible for implementing where "Congress delegated authority to the agency generally to make rules carrying the force of law, and . . . the agency interpretation claiming deference was promulgated in exercise of that authority."  *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  Generally, *Chevron* deference is reserved for agency interpretations resulting from

10

formal agency action as "it is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster fairness and deliberation that should underlie a pronouncement of such force." *Mead*, 533 U.S. at 230.  Where "the statute is silent or ambiguous with respect to the specific issue" and *Chevron* deference applies, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  Alternatively, where an agency interpretation is not entitled to *Chevron* deference, the court looks to whether the interpretation has "the power to persuade."  *Mead*, 533 U.S. at 228 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

### 3.  Clearcutting

The first issue raised by plaintiffs is whether the Forest Service properly interpreted "appropriate tools" under HFRA to include clearcutting, which the Forest Service defines as removal of "all trees in the stand in one entry."  R. at D06676 n.8. HFRA defines "authorized hazardous fuel reduction project" by reference to the definition of "appropriate tools" included in the Implementation Plan, a document initially drafted before enactment of HFRA and later revised.  *See* 16 U.S.C. § 6511(11).  The Implementation Plan includes "tree removal (to produce commercial or pre-commercial products" as an appropriate tool.  R. at D02842.  In the context of the project, the Forest Service interpreted "appropriate tools" to include clearcutting after the public had an opportunity to comment on its February 2010 scoping letter and object to its Supplemental EA, both of which notified the public that the project was proceeding

under HFRA and would involve clearcutting.  *See* R. at D03093; D06674.  Although the

Supplemental EA is not a rule, it was generated through a sufficiently formal process,

one which importantly included opportunity for public comment, such that its

interpretation of HFRA should be afforded *Chevron* deference.  *See Wilderness Soc'y

v. United States Fish & Wildlife Serv.*, 316 F.3d 913, 922 (9th Cir. 2003) (finding that a

permit issued after the preparation of an EA and a FONSI merited *Chevron* deference).

Applying the two-step *Chevron* analysis to the agency's interpretation, the Court

finds that the interpretation is a reasonable one in light of HFRA's ambiguity.  First,

HFRA and its incorporation of the Implementation Plan are ambiguous in that they do

not specifically define the range of methods for clearing away trees covered by the term

"tree removal."  *See* 16 U.S.C. § 6511(11); R. at D03093.  Second, clearcutting is a

permissible interpretation of "tree removal" and "appropriate tools" under the statute.

*See Chevron*, 467 U.S. at 843; R. at D6856 (explaining that "tree removal" is not a

silvicultural term but can refer to a wide range of silvicultural treatments).  Therefore,

the *Chevron* analysis is satisfied as to clearcutting.

Even if the Forest Service's interpretation is not due *Chevron* deference, it is still

reasonable and has the power to persuade.  *See Mead*, 533 U.S. at 228.  The Forest

Service considered the issue thoroughly.  It applied its expertise and experience

treating other beetle infestations, where the selective removal of only dead and infested

trees did not eradicate the problem, and concluded that clearcutting is an appropriate

tool to achieve the objectives of HFRA.  *See* R. at D06676.  Moreover, the agency

engaged in sound reasoning when it read the umbrella term "tree removal" to include

clearcutting, the removal of all the trees in one stand.  Therefore, even under lesser

*Skidmore* deference, the agency's interpretation is reasonable.  *See Skidmore*, 323

U.S. at 140.

### 4. Cost Effective

Plaintiffs also argue that the project cannot proceed under HFRA because it is

not cost effective, as required by the Implementation Plan.  Neither the Implementation

Plan nor HFRA itself defines "cost effective."  *See* 16 U.S.C. § 6511; R. at D02842-43.

The Forest Service's interpretation of "cost effective" comes from the Forest Service

Manual, which defines the term as "achieving specified outputs or objectives under

given conditions for the least cost."  R. at D06857.  Defendants argue that this

interpretation should be afforded *Chevron* deference, Docket No. 73 at 26, while

Plaintiffs argue that it should be afforded no deference and is unreasonable.  Docket

No. 78 at 5.

Plaintiffs are correct that the Forest Service Manual should not be afforded

*Chevron* deference.  *See Forest Guardians v. Animal & Plant Health Inspection Serv.*,

309 F.3d 1141, 1143 (9th Cir. 2002) (Forest Service Manual not entitled to deference

because it does not bind the agency and does not have the force of law).  However,

that the Forest Service Manual is not entitled to *Chevron* deference does not mean that

it is entitled to no deference whatsoever.  Rather, informal agency interpretations are

still entitled to some deference or "respect" under the factors set out in *Skidmore*, 323

U.S. at 140.  *See Mead*, 533 U.S. at 234-35.  In applying the *Skidmore* framework,

courts look to the interpretation's thoroughness, the validity of its reasoning, its

13

consistency with earlier decisions, and "all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.

Here, the Forest Service's interpretation of "cost effective" is reasonable in the context of the goals of HFRA. Plaintiffs argue that, by defining cost effective as "achieving specified outputs or objectives under given conditions for the least cost," the Forest Service has reduced what should be an analysis of whether a particular objective will produce sufficient returns for its required investment to an assessment of whether a particular method of achieving a predetermined objective is cheapest. *See* Docket No. 78 at 5-6. However, this understanding of "cost effective" is eminently logical given that HFRA itself directed the Forest Service to "reduce wildfire risk to communities" by implementing "hazardous fuel reduction projects," and thereby set the project's broad objectives. *See* 16 U.S.C. § 6501. It was then reasonable for the Forest Service to read the Implementation Plan's requirement that the project be "cost effective" to mean that it must employ a relatively cheap method to achieve the objectives given in the statute. Therefore, the Forest Service's interpretation of "cost effective" is not arbitrary or capricious. *See* 5 U.S.C. § 706(2)(A).

Moreover, the Forest Service's finding that the project itself is cost effective is also reasonable. Plaintiffs do not contend that there are any more economical alternatives to treat the beetle-infested acreage the project addresses. Instead, plaintiffs argue that the project cannot be cost effective because it "will cost the Forest Service nearly $1 million while generating little more than $150,000 in revenues." Docket No. 78 at 7. Plaintiffs suggest that to be "cost effective" the project must be "economical" in that it produces a valuable return; however, they ignore the fact that the

14

Forest Service found the project will mitigate the beetle infestation and create non-monetary benefits in the long-term. *See* R. at D06742 (noting the project's benefits to public health and safety); R. at D06744 (the project will "increase[] the amount of fully stocked lodgepole pine regeneration" and "reduce the potential hazardous fuels in the project area"). Therefore, the Forest Service was reasonable in concluding that the project is cost effective.

### 5.  *Summary of HFRA*

Because the Forest Service was reasonable in concluding that the project uses "appropriate tools" and is "cost effective," the Court finds that the project is authorized under HFRA and that the Forest Service's employment of abbreviated administrative procedures was not arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

### B.  <u>Failure to Prepare an EIS</u>

Plaintiffs' next claim asserts that the Forest Service acted arbitrarily and capriciously by failing to prepare a full EIS for the project. Plaintiffs argue that the Forest Service committed a clear error in judgment when it found that the project would have no significant impact on the human environment. Docket No. 72 at 18-24. NEPA requires an EIS where a proposed project will "significantly affect [] the quality of the human environment." 42 U.S.C. § 4332(C). However, before preparing an EIS, an agency may prepare an EA to assess the project's potential environmental impacts and determine whether an EIS is required. 40 C.F.R. § 1508.9. If a project will not significantly affect the human environment, the agency may issue a FONSI in lieu of an EIS, as the Forest Service did here. *See id*.; *Utah Envtl. Congress v. Bosworth,* 439

15

F.3d 1184, 1194 (10th Cir. 2006).  When reviewing a FONSI, the court "must determine whether the agency acted arbitrarily and capriciously in concluding that the proposed action 'will not have a significant effect on the human environment.'"  *Utah Envtl. Congress v. Russell*, 518 F.3d 817, 824 (10th Cir. 2008) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1112 (10th Cir. 2002)).

Plaintiffs contend that the Forest Service acted arbitrarily and capriciously in concluding that the project would not significantly impact the environment because the project by its very nature is intended to affect the environment, the size of the project demonstrates its impact, and it will significantly impact the recreation and scenic value of the area.  Docket No. 72 at 20-24.  Plaintiffs' first argument is flawed since an agency's determination that a project will generate some beneficial effects does not necessarily mean the project will have a "significant" impact so as to require a full EIS under NEPA.  *See, e.g.*, *Utah Envt'l Congress*, 518 F.3d at 831 (upholding FONSI where project's purpose was to improve habitat by harvesting trees).[2]  Nor do plaintiffs argue that the beneficial effects of the project are so great so as to suggest the agency did not "examine[] the relevant data" or "articulate[] a rational connection between the

_____

[2]  Defendants urge the Court to follow *Friends of the Fiery Gizzard v. Farmers Home Admin.*, 61 F.3d 501, 505 (6th Cir. 1995), and hold that an EIS is not required where a project is found to have only significant beneficial impacts.  Despite Tenth Circuit opinions suggesting a similar rule, *see Utah Envt'l Congress v. Russell*, 518 F.3d at 831, the Tenth Circuit has not squarely addressed whether a project with a purely beneficial but significant effect requires an EIS.  Furthermore, the Ninth Circuit has recently noted disagreement in the circuits on this issue.  *See Humane Soc. of United States v. Locke,* 626 F.3d 1040, 1056 n.9 (9th Cir. 2010).  Here, the Court need not address this issue because defendants do not concede that the project's beneficial impact is "significant" under NEPA, nor do plaintiffs argue that the project's beneficial impacts are sufficiently "significant" in and of themselves to require an EIS.

16

facts found and the decision made" when it concluded the project would not have a significant impact.  *See Citizens' Comm.*, 513 F.3d at 1176.  Therefore, the nature of the project, in and of itself, does not trigger the need for an EIS.

Plaintiffs next argue that the sheer size of the project, affecting 18% of the dominant species of tree in the analysis area, necessitates that the project will have a significant impact on the environment.  Docket No. 78 at 9-10.  Plaintiffs do not demonstrate, however, that the Forest Service abused its discretion in concluding that the project's size does not constitute a significant impact.  Eighty percent of the area of the Upper Eagle River Watershed will have no management activities through the project.  Moreover, when understood in the larger context of the entire forest, the Supplemental EA concludes that the project will "treat only about 2.6% of the lodgepole pines across the Holy Cross District."  R. at D06742.  Even assuming that the project does impact a relatively large area, plaintiffs have not provided any support for the contention that an EIS is necessary when a project reaches a certain size.  *See TOMAC v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006) (rejecting plaintiff's argument that sheer magnitude of project necessitated EIS).

Plaintiffs additionally argue that the Forest Service was required to prepare an EIS because the project will have significant impacts on recreation and scenic value of the forest.  As to recreation, plaintiffs argue the closure of Tigiwon road will result in restricted access to Mount of the Holy Cross, several trails, and a campground.  Docket No. 72 at 22-23.  The Forest Service adequately considered the impact road and trail closures would have on recreation in the area and concluded it was not significant.  *See* R. at D06730-31.  Specifically addressing the Mount of the Holy Cross, the Forest

17

Service noted that an alternate route was still available to access the peak.  *See* R. at D06731.  As to the scenic value of the area, the Forest Service also adequately considered the issue and concluded that over the long-term the project would not have a significant impact on the aesthetics of the area.  *See* R. at D06726-28.  On both of these issues, the record demonstrates that the agency took the requisite "hard look" and did not act arbitrarily in reaching the factual conclusion that the impact to recreation and scenery would be minimal.  *See New Mexico ex rel. Richardson*, 565 F.3d at 713.

Finally, plaintiffs argue that the project will have a significant impact on the residents of Minturn due to the noise generated by helicopter logging and the temporary increase in fire hazards.  *See* Docket No. 72 at 24.  The Supplemental EA, however, considered these potential impacts in detail and concluded that the impacts in these areas would not be significant.  *See* R. at D06735-38, D06705-11.  The Court therefore finds the Forest Service also took a hard look at these questions and did not act arbitrarily in concluding that they did not constitute significant environmental impacts. *See New Mexico ex rel. Richardson*, 565 F.3d at 713.

## C.  Helicopter Logging and Logging Outside Boundaries of Unit 101

Plaintiffs' final two claims assert that defendants violated NEPA because the results of its Supplemental EA were predetermined.  Plaintiffs argue that, although the Forest Service considered whether to engage in helicopter logging in Units 101, 113, and 114, and whether to engage in logging outside the originally disclosed boundaries of Unit 101, this analysis was meaningless because its results were predetermined.  Docket No. 72 at 25-28.  Defendants respond that plaintiffs cannot bring these claims

18

before the Court because they failed to exhaust them during administrative review, and in any case, the results of the Supplemental EA were not predetermined.  Docket No. 72 at 44-49.  Plaintiffs' reply does not address these claims.  *See* Docket No. 78.

The Court finds that plaintiffs did not exhaust their administrative remedies before raising these claims.  Nowhere in plaintiffs' objections to the Supplemental EA did plaintiffs contend that the Supplemental EA's results were predetermined.  *See* R. at D06836-51.  As HFRA allows the Court to consider an issue "only if the issue was raised in [the] administrative review process," the Court finds that these claims were not administratively exhausted and cannot be considered here.  *See* 16 U.S.C. § 6515(c)(2).

## V.  CONCLUSION

The Court finds that the Forest Service complied with HFRA, NEPA, and the APA in approving the project and upholds the June 2010 Decision Notice and FONSI.

Therefore, it is

**ORDERED** that the Decision Notice is affirmed.  It is further

**ORDERED** that plaintiffs' Second Amended Complaint [Docket No. 53] is dismissed.  Judgment shall enter against plaintiffs and for defendants.


DATED January 31, 2011.

                              BY THE COURT:


                               s/Philip A. Brimmer
                              PHILIP A. BRIMMER
                              United States District Judge